STATE of Missouri, Respondent,

v.

Robert O. KENNEDY, Appellant.

No. 11307.

Missouri Court of Appeals,
Southern District,
Division Three.

March 26, 1980.

John D. Ashcroft, Atty. Gen., Paul Robert Otto, Asst. Atty. Gen., Jefferson City, for respondent.

Daniel V. O'Brien, St. Louis, for appellant.

TITUS, Judge.

Defendant was charged with second degree murder (§ 559.020)[1] in the killing of Raymond D. Niswonger, Jr., on the parking lot of the Knights of Columbus Hall (K.C. Hall) in Leopold, Bollinger County, Missouri. Following a change of venue, a Wayne County jury declared defendant guilty of manslaughter (§ 559.070) and fixed punishment at imprisonment for 10 years. § 559.-140. This appeal ensued.

Defendant and his brother James attended a dance at the K.C. Hall the night of November 26–27, 1977. Chaperon Jansen evicted defendant from the hall for peace disturbance but defendant soon returned to the fray. In the process of brother James thereafter being thrown out of the hall for standing atop a table and waving a beer bottle at the assemblage, defendant engaged in fisticuffs with another boy. Chaperon Jansen and Deputy Sheriff Arnzen escorted defendant and brother James to the parking lot and told them to remain in their Pontiac automobile until reinforcements arrived from the sheriff's office. When a dance-attendant mistakenly inquired why the brothers were being set free, defendant struck the inquirer with a beer bottle and, without official leave, defendant and brother James departed the parking lot with the declaration "they would get even with these boys from Lutesville."

Before defendant's and brother James' departure from the parking lot, the license number of their Pontiac car had been obtained and it was learned that they had a pickup-camper elsewhere which contained firearms.

When Deputy Sheriff Gilmore arrived at the K.C. Hall near 11:45 p. m., he was told of the foregoing and that defendant's and brother James' mother and stepfather resided in Lutesville, some six or seven miles from Leopold. The information was radio-dispatched to the authorities, including Police Chief Robins of Lutesville. Deputies Gilmore and Arnzen then departed in search of the brothers.

At about 11:50 p. m., Chief Robins saw the aforementioned Pontiac and a green Ford pickup adorned with a camper parked at the residence of the mother of defendant and brother James in Lutesville. He also observed a person leave the residence and get into the passenger side of the pickup before it was driven away in the direction of Leopold. Robins lost the pickup in traffic and dispatched his sightings to the authorities by radio.

Two sisters, who had attended the dance, estimated that between 12:30 and 1:00 a. m., November 27, they had seen a pickup-camper parked a short distance from their Leopold home situate near the K.C. Hall. One sister observed a person leave the passenger side of the pickup and re-enter on the driver's side before the vehicle was driven away. Whether these observations occurred before or after the killing is not clear.

---

1. References to statutes, rules and MAI–CR are to RSMo 1969, Missouri Supreme Court Rules, V.A.M.R., and Missouri Approved Instructions-Criminal.

■ An aside: Various witnesses at trial identified a photograph of the pickup-camper in which defendant and brother James were apprehended as looking like or looking similar to the vehicle they had seen on the night in question. Such testimony was sufficient to warrant these observations into evidence. *State v. Williams*, 515 S.W.2d 544, 549[3] (Mo.1974); *State v. Stark*, 590 S.W.2d 690, 692[2] (Mo.App.1979). Moreover, defendant's stepfather was positive in his identification of the photographic exhibit as being a picture of the pickup-camper belonging to defendant.

Close to 12:45 a. m., November 27, Steve Stoverink parked his pickup truck on the K.C. Hall parking lot. He was accompanied by his brother and a friend. Shortly thereafter Junior Niswonger, the victim, parked his car alongside the pickup so that the drivers' doors of the vehicles were adjacent. Stoverink and Niswonger conversed briefly before another pickup with "a camper on it" drove onto the lot and stopped 35 to 40 feet to the rear of Stoverink's truck. The brightly burning headlights of the newly arrived pickup-camper shown into Niswonger's eyes and irritated him. Niswonger drove forward and stopped by the side of the offending pickup-camper so that the drivers' doors of the two vehicles were opposite one another. Stoverink returned to conversing with his companions. Presently Stoverink heard "some hollering back there" and, by looking in a rearview mirror, saw "a person standing with a [long] gun beside [Niswonger's] car door, kicking on it and hollering." Stoverink could not tell the sex of the kicking-hollering person by sight but concluded it was male because of the voice. Niswonger alighted from his car with arms raised overhead while the "hollering" continued and the "long gun" was being pointed at him. A shot was fired but Stoverink saw that Niswonger was still standing. A second shot was fired and Stoverink saw Niswonger fall to the ground. The person with the "long gun" got into the pickup-camper (side unknown) and it was driven off the parking lot in the direction of Lutesville. Stoverink and his companions then ran back to where Nis-

wonger was lying on the ground apparently and actually dead. .

Deputy Gilmore returned to the K.C. Hall about 1:35 a. m. and radio-notified State Trooper Burg concerning the events and gave a description of the pickup-camper. The deputy also found an expended .12 gauge shotgun shell on the lot near Niswonger's body.

Two miles south of Lutesville Trooper Burg saw the described pickup-camper, pursued it and stopped it short of the town. Another officer arrived just as the camper was being halted. The occupants of the pickup-camper were ordered to come out the driver's side. Defendant emerged first, followed by brother James. Inside the pickup was a 30.06 bolt action rifle and a .12 gauge single shot shotgun. A spent cartridge was found in the barrel of the rifle and three live cartridges were found in its magazine. The shotgun was empty of shells. Flesh and blood was on the front sight, muzzle, barrel and stock of the rifle. Also inside the pickup was a shotgun shell vest. Eleven of its twelve shell compartments were filled with loaded shotgun shells—the twelfth was empty.

The state's forensic expert testified to the following effect. Niswonger was killed by a rifle bullet fired at close range; the bullet had entered Niswonger's back and exited his front; the blood found on the forepart of the rifle was the same type and classification of that of the deceased; brother James' shirt was spattered with blood of decedent's type; residue swabs of brother James' hand inconclusively showed use of a firearm and the presence of blood of deceased's type; the shotgun casing found at the scene of the crime had been fired in the .12 gauge shotgun found in the pickup-camper.

■ In criminal homicide, as in other crimes, most jurisdictions, including Missouri, hold that proof of the corpus delicti requires the introduction of enough evidence to establish the fact that a crime has been committed but that proof of defendant's connection therewith is not a part of

the corpus delicti. *State v. Smith*, 354 Mo. 1088, 1095, 193 S.W.2d 499, 502[7] (1946); 41 C.J.S. Homicide § 312, at p. 6. Nonetheless, and although defendant's connection with the crime is not part of the corpus delicti, proof of defendant's criminal agency is an element essential to his conviction. *State v. Murphy*, 415 S.W.2d 758, 760[3, 4] (Mo. banc 1967). Defendant herein does not contest the existence of the corpus delicti, i. e., that Junior Niswonger was killed by criminal conduct. Consequently, defendant's connection with the crime as the principal or as an aider and abettor is the central issue to be determined in this case.

■ Our statute, § 556.170, provides: "Every person who shall be a principal in the second degree in the commission of any felony, or who shall be an accessory to any murder or other felony before the fact, shall, upon conviction, be adjudged guilty of the offense in the same degree, and may be charged, tried, convicted and punished in the same manner, as the principal in the first degree." "It has been consistently held that this section of our statutes in fact abolishes all distinction between principals to a crime and accessories before the fact, or 'aiders' and 'abettors', if certain facts are shown. . . . Among the essential facts necessary to hold an accessory before the fact, as a principal to the crime, are that he 'aided, abetted, assisted or encouraged' the criminal act, . . .; that he 'associated himself with the venture' or 'affirmatively participated in it as something he wished to bring about', or that he sought 'by his action to make it succeed' or that he was engaged in a 'common cause' or 'common design' and that there was an '*intent* to encourage or abet the crime committed.'" *State v. Lemon*, 504 S.W.2d 676, 682[8, 9] (Mo.App.1973). Indicia of aiding or abetting are, inter alia, presence at the scene of the crime, flight therefrom and association with another involved before, during and after the offense. *State v. Taylor*, 542 S.W.2d 91, 93[2, 3] (Mo.App.1976).

■ Under the provisions of the aforementioned § 556.170, and the authorities just cited, it is unnecessary to sift the evidence to determine whether defendant or brother James actually fired the gun which inflicted the fatal wound. If there was substantial evidence for the jury to find beyond a reasonable doubt that either defendant or brother James (it does not matter which) fired the shot that killed Junior Niswonger and that, at such time, they were acting together for a common purpose by actively participating in the crime, both or either could be charged, tried, convicted and punished as principals even though Junior's death was literally caused by only one of them. *State v. Lunsford*, 331 S.W.2d 538, 540[2] (Mo.1960); *State v. Sheard*, 276 S.W.2d 191, 194[5] (Mo.1955). As quoted in *State v. Grebe*, 461 S.W.2d 265, 266 (Mo. banc 1970), "The practical effect of the statute [§ 556.170] is to virtually abrogate the distinction between principals and accessories."

■ In our opinion, the jury could have reasonably found the following. Defendant and brother James were evicted from the K.C. Hall in Leopold for fighting and other acts and misconduct. Instead of waiting for supplemental authority as directed, the brothers left in a Pontiac automobile vowing to "get even with the boys from Lutesville." The Pontiac was next seen at the Lutesville home of the boys' mother together with a pickup-camper belonging to defendant which soon left in the direction of the K.C. Hall. Soon thereafter the pickup-camper was near and at the scene of the crime. At the scene, the vehicle was parked adjacent to the victim's automobile and a man from the pickup-camper was holding a "long gun," kicking on the victim's car, "hollering" and forcing the victim to alight from his auto. When the victim left his car with arms upraised, a shotgun was fired and the shell casing therein was ejected onto the ground where it was later recovered. Soon thereafter another gun fired a single solid projectile which passed, from rear to front, through the victim's body killing him. The man standing on the ground got into the pickup-camper and it immediately left. Thereafter the pickup-camper was stopped when traveling from

Leopold to Lutesville. Inside the pickup was defendant (the driver), brother James, a loaded rifle containing a spent cartridge and the shotgun that had fired the shell found at the scene of the crime. Blood found on the rifle and on James' clothing was the same type and classification as that of the. deceased. This was sufficient to sustain the jury's guilty verdict.

 Defendant's second and final point relied on contends the trial court erred in giving Instruction No. 5 (submitting second degree murder) and Instruction No. 6 (submitting manslaughter) by including an improper modification of MAI–CR 2.12 in each instruction. There are three things wrong with this point. First: As defendant did not allege the specific objections now made to the instructions at the instruction conference or in his motion for a new trial, the matter has not been preserved for appellate consideration. Rules 28.03 and 29.11(d). We do not consider it as plain error because such error, as it relates to jury instructions, results if the trial court misdirects or fails to instruct the jury on the law of the case so as to create manifest injustice. As hereafter seen, such is not the case. *State v. Murphy*, 592 S.W.2d 727, 733[17] (Mo. banc 1979). Second: Defendant was not found guilty of second degree murder (Instruction No. 5) but of the lesser offense of manslaughter (Instruction No. 6). Therefore, any error, if so, in Instruction No. 5 was not prejudicial to defendant. *State v. Brooks*, 567 S.W.2d 348, 351–352[8] (Mo.App.1978) and cases there cited. Third: The second or last numbered paragraph of Instruction No. 6 reads: "Second, that the defendant acted either alone or knowingly and with common purpose together with James L. Kennedy in the conduct referred to in the above paragraph, then you will find the defendant guilty of manslaughter." MAI–CR 2.12 reads: ". . . (Second) (Third) ([*last numbered paragraph*]), that the defendant acted either alone or knowingly and with common purpose together with [*insert name or names of person or persons referred to in other paragraphs with whom defendant acted. . . .*] in the conduct referred to in the above para-

graphs, then you will find the defendant guilty (under Count ___) of _____." Instruction No. 6 did not modify or deviate in the slightest from MAI–CR 2.12, so the point has no merit.

Judgment affirmed.

All concur.