STATE of Missouri, Respondent,

v.

Edward L. NEWBOLD, Appellant.

No. WD 37,132.

Missouri Court of Appeals,
Western District.

April 28, 1987.

Motion for Rehearing and/or
Transfer to Supreme Court Denied
June 2, 1987.

Application to Transfer Denied
July 14, 1987.

Before BERREY, P.J., and
KENNEDY and MANFORD, JJ.

### ORDER

374

Donald L. Wolff, Bonnie J. Miller, Wolff & Mass, Clayton, for appellant.

William L. Webster, Atty. Gen., Carrie Francke, Asst. Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before PRITCHARD, P.J., SHANGLER, J., and CONLEY, Special Judge.

SHANGLER, Judge.

The defendant Newbold was convicted by a jury of murder in the second degree, and was sentenced by the court to life imprisonment as a persistent offender. It was the theory of the prosecution that Newbold and Susan Levy acted with the common purpose to lure Marshall [Beau] Levy, her estranged husband, to her home to kill him, but guised as an act of self-defense. The defendant Newbold contends on appeal that the evidence was insufficient to submit the offense on that, or any other theory. The defendant contends, rather, that the evidence conclusively proved self defense and defense of habitation—and hence entitlement to acquittal as a matter of law.

The homicide was the culmination of an interwoven sequence of events which brought the victim Beau Levy to the house occupied by Susan at 1606 Elmwood in Kansas City on the evening of January 24, 1984. Susan lived there with Michelle, a daughter by Beau, and with Newbold, her lover.

In order to explain the progression of events to the homicide, it is necessary to reconstruct a number of scenes, some of them coincident, acted out by the principal players. In addition to Susan Levy, Beau Levy and Newbold, the principal actors included Mark Sellars [Susan's step-brother], Linda Sellars [Mark's estranged wife], Larry Archer [Linda Sellars's paramour], and Carl Levy [Beau's brother]. There were others, as well. At the time of the homicide on January 24, 1984, Susan, daughter Michelle, and Newbold [as we note] lived together at 1606 Elmwood. Susan was then also intimate with a man named Garcia. Beau, estranged from wife Susan, lived with a friend, Hickman. Mark Sellars and wife Linda were also estranged, and Mark lived with Carl Levy, brother of the victim, Beau. Linda was then involved in a liaison with Larry Archer.

In the early afternoon of January 24, 1984, Beau Levy visited Susan at 1606 Elmwood. Susan had asked Beau to look after their daughter, Michelle, that night so that she could go out with her sister, Wanda Ray and with Linda Sellars. Beau then left the home. Mark Sellars testified that Beau told him later that day to tell Susan that he was drunk and would not be able to take care of Michelle that night. At about 3 p.m., Wanda Ray [Susan's sister] and Linda Sellars [Susan's step-sister-in-law] arrived. The three women were going out together that evening. Linda testified that when they arrived, Newbold and Susan were in argument, and Susan wanted Newbold out of the house.

Somewhat after 6 p.m., Linda Sellars left for the house of Carl Levy, about four blocks away. Mark, her estranged husband, lived with Carl, and she wanted to ask him to keep their children for the weekend so that she could go out with Susan Levy. Beau Levy and Newbold also stayed there at times. When Linda arrived, Mark, Carl, Brenda Kerns, Michaelyn Edwards and Bill Nelson were in the midst of a party. They had been drinking since 4:00 that afternoon. At about 7:30 p.m., Newbold telephoned. The evidence conflicts as to whether it was Carl Levy or Michaelyn Edwards who talked to Newbold. The message was to tell Mark Sellars that Archer [Linda's paramour] was on his way with a gun to kill him. Carl Levy conveyed the information to Mark Sellars.[1] Linda decided to get away from there rather than be "around a bunch of gun play," and returned to Susan Levy at 1606 Elmwood. There she saw Archer standing across the street near his car.

Linda went into the Susan Levy house without talking to Archer. Newbold was still there. Linda asked Newbold "what the hell he thought he was doing," and Newbold responded that it was none of her business. Their words became heated, and Newbold said he would return when Linda had gone. Linda went outside to join Archer. They drove to a local grocery store, and then to the park, where they lingered. According to Linda, by the time they returned to 1606 Elmwood, Beau Levy was already dead. Archer was not armed, she said.

---

1. The disparate accounts of the numerous episodes which culminated in the homicide are rife with uncertainty, ambiguity and contradiction. In this particular tableau, Michaelyn Edwards testified that she took the telephone call from Newbold and that only she spoke with him. Her version was that Newbold said: "[T]o tell Mark Sellars just that Larry Archer was on his way to kill Mark Sellars." Michaelyn answered: "Okay," hung up the telephone, looked at Mark and said, "Larry Archer is on his way up here to kill you."

It was the Mark Sellars version that Carl Levy spoke with Newbold, and told Sellars that "Larry Archer was on his way to your house with a gun to get you."

Carl Levy, on the other hand, testified that he took the call and Newbold told him: "[T]here was a person at my brother's house, a Larry Archer, and said that he was at my brother's house making threats towards my sister-in-law and niece."

In the meanwhile, at the Carl Levy house, Sellars was concerned about the Newbold telephone call, and decided to arm himself. Sellars telephoned David Hickman [with whom Beau Levy was living] for a shotgun, and Carl Levy assured Hickman "it was all right to go ahead and loan [Sellars] the shotgun." Brenda Kerns drove Sellars to the Hickman house to get the weapon. Mark and Brenda then drove to the Susan Levy house at 1606 Elmwood to look for Archer. They pulled into the alley at about 8:15 p.m. Sellars remained in the car with the shotgun while Brenda went inside to see if Archer was there. He was not, and the two returned to the Carl Levy house.

Shortly after Sellars returned to the Carl Levy house, Newbold arrived. According to Sellars, it was then 8:15 p.m. Sellars testified that in addition to Brenda Kerns, Michaelyn Edwards was there, as was Bill Nelson. Carl Levy, himself, testified that he was then out to replenish the beer, although Sellars accounted him among those present when Newbold arrived. Mark Sellars gave this account of the event: "Ed [Newbold] walked in and said he needed a shotgun, or needed something down there to protect Sue and Michelle." Newbold ascribed as the reason: "Because Larry [Archer] was down there waving a pistol earlier." Mark Sellars, Brenda Kerns and Newbold then went to the home of David Hickman to get another gun. This second weapon, a 12–gauge sawed-off shotgun, had already been requested by Carl Levy even before Newbold arrived— presumably to protect himself in the event Archer appeared to attack Mark Sellars, who also lived there. The three, Sellars, Kerns and Newbold, then proceeded to the Susan Levy house to see if Archer was there. He was not there, so Sellars and Kerns returned to the Carl Levy house, while Newbold remained with the shotgun "to protect Sue and Michelle."

Nelson was also at the Carl Levy house when Newbold arrived, and gave this narration of the event. It was then about 6:00 p.m. Michaelyn Edwards was also there, but not Mark Sellars or anyone else. Carl Levy was also gone. "Well, he [Newbold] walked in the door, he said there was—Larry Archer was down at Sue's house waving a gun at Beau's wife and daughter and he had better get a pistol and get down there." [Sellars's narrative did not mention Beau Levy or that Newbold exhorted that Beau "had better get a pistol and get down there."] Nelson said that Newbold then "stuck around for a little bit and then he walked out the door." [Sellars's narrative was that Newbold left with him and Kerns to obtain a gun from Hickman.] Then Beau Levy "walked in the door," and Nelson recounted to Beau "exactly what Mr. Newbold had said, that Larry Archer was down at Sue's house waving a gun at his wife and daughter and he'd better get a pistol and get down there." With that, "Beau just turned around and calmly walked out the door; he said he'd go see what was—what was wrong."

Michaelyn Edwards was also present when Newbold walked into the Carl Levy house. Her narrative presented a third version of that event: "He [Newbold] said that Larry Archer had been at Sue and Beau's house, Levy's house—that Linda was taking up for Larry Archer, Larry Archer was there waving a gun around and everything; and that he was upset because Linda was taking up for Larry." Michaelyn Edwards recounted also: "He [Newbold] said to tell Beau that he ought to come down there and see what was going on, that—that Sue was—that Linda was down at his house being on Larry Archer's side and he didn't like it." Newbold left. Then Beau arrived. Michaelyn Edwards told Beau "that there was trouble down there at his house and he ought to go down there." Beau responded casually: "I think I'll go down there and see what's going on."

Mark Sellars and Brenda Kerns, it will be recalled, separated from Newbold at the Susan Levy house when Archer was not found there. Newbold remained behind with the shotgun to protect Susan and Michelle, and Sellars and Kerns returned to the Carl Levy house. Enroute, Mark saw Beau Levy's truck parked across the street from the Frank Green house, not far from

their destination, the Susan Levy house. Brenda Kerns sounded the horn, and Beau emerged. Mark asked Beau what he was doing, and Beau replied: "I'm getting a pistol." It was a .9 millimeter automatic. Beau told Mark: "I'll meet you up at Carl's house." Mark and Brenda returned to Carl Levy but Beau never came. Five or ten minutes later Carl Levy received a telephone call that Beau had been shot.

The discrepancies among the various accounts as to the times of the events render it difficult to recast the movements of Beau Levy exactly during the time before Mark Sellars saw him at the Green house, moments before the homicide. It was the testimony of Diana Rowland that at 6:00 p.m. or so she and Beau drove to Independence to pick up Steve Hickman, David Hickman's brother. [Beau lived with David Hickman] They returned to Kansas City at about 7:30 p.m. and went to her house. Shortly thereafter, Beau received a telephone call from David Hickman, who told him that brother Carl had an urgent need to speak with him, and that he should come there at once. It was then about 8:30 p.m. Beau left immediately, and—according to Diana Rowland—Beau did not appear to be agitated by the call. She said also that Beau had had nothing to drink that afternoon and was not intoxicated. Beau arrived at the house of his brother, Carl Levy, and Michaelyn Edwards and Bill Nelson were there, but not Carl. It was then, as already noted, that Edwards and Nelson related to Beau what Newbold had told them: that Archer had been at the Susan Levy house "waving a gun around." Beau was not upset by the news, but said calmly that he would go to Susan's "to see what was wrong."

The sequence of events resumes at the Susan Levy house. Newbold arrived with a shotgun and parted from Sellars and Kerns when Archer was not to be found. Susan, Wanda Ray [her sister] and Jesse Brown were there. Brown had come to tow Susan's truck. Brown testified that Newbold showed him the shotgun. He stated also that Susan told Newbold that Beau Levy "would be over in a little bit," and Newbold replied, "That's good."

Brown felt a presentiment that "something might be coming down that [he] had no business into"—and so went outside to attend to the tow of the truck. Wanda accompanied him to move her car to enable Brown to attach the tow to the truck. Wanda moved her car, but before Brown could move into that space, a truck had taken the place. It was Beau Levy's vehicle. The lights were on and the engine was running. Brown parked nearby and saw Wanda lying on the sidewalk for refuge. The homicide had occurred.

Precisely what happened in the brief interval after Jesse Brown and Wanda Ray left the house and the shooting is in dispute. The solid wood front door to the 1606 Elmwood premises, the police investigator described, was combined with an exterior metal storm door. Two full prints of the boots Beau wore were impressed on the exterior of the inner wood door near the handle. The kicks Beau administered fractured the door. Beau was armed with an .9 mm automatic pistol, which had been fired. The expended cartridge and lead fragment were found on the cement porch in front of the premises. No shot was fired from that gun through the front door. Four rounds were fired from a 12-gauge shotgun from the interior through the front door. One of them struck Beau full in the chest and killed him. The window of the door was covered with a curtain so that a person inside could not see who was outside.

The neighbors converged on the scene when they heard the shots. Lisa Comacho, Judy Hall and Shane Hall, who were two doors away, came to the Susan Levy house. Kevin Metcalf, a boy from across the street, also came there. Judy Hall and son, Shane, ran out the door when they heard the shots. She saw Beau prostrate and wounded, and screamed for Susan to open the door and call an ambulance. In a matter of minutes, Susan opened the door at 1606 Elmwood and "set down a gun as she come through the door." Judy heard Wanda, Susan's sister, ask Susan, moments after the shooting, "Why did you do it?" Lisa Comacho also came out when she

heard the shots, saw Beau on the ground, and then saw Susan come out of the house. She heard Susan say, "I" or "We" [Lisa was not sure which it was] "heard shots and we shot back." She also heard Susan tell Kevin Metcalf to go hide the gun. Kevin, a neighbor boy, testified that Susan told him "to hide the gun" at "some person's house" whose name he had forgotten. He found the gun propped up against the frame of the front door of Susan's house, "grabbed it and went to the back door." Newbold was in the house and helped him out the back door. He cautioned Kevin that the gun might be loaded, so told him to "hurry up, and to be careful." Kevin was frightened, so he hid the gun in the garage of the home of the person he thought Susan named. He later led the police at the scene to the shotgun. The pistol used by Beau was found the next day nearby where he fell.

Another statement must be mentioned. It was the trial testimony of Jesse Brown that after the incident, but before the police arrived, Newbold came out of the house, "went over and looked at Beau," then came to Brown and said: "Jesse, looks like I've shot Beau ... He come up there and shot through the door ... I just turned around and got the shotgun that I had in my hands and shot three times through the door ... I didn't know it was Beau." Brown did not mention the Newbold statement to the police during the interview at the scene because they did not ask him. It was not until just before the trial, over a year later, that Brown disclosed the statement to the prosecutor.

Newbold was questioned by the police, at first as a witness, but then as a suspect. Newbold chose to talk despite the *Miranda* warnings. He told the police that he was in another room when he heard a "pop," a kick on the door, then Susan scream: "Who is it?", and finally, loud explosions come from the living room. Only he and Susan were then in the house. Newbold had given Susan the gun he had obtained through Carl Levy. Newbold, in response to questions, told the police he did not fire the gun, but that Susan would probably say that he did "because of the fear of going to jail and

having to not be around her little kid—little baby Michelle." At the conclusion of the interrogation, the police performed a gun residue test on Newbold. The results were negative. No such test was performed on Susan Levy.

Newbold was charged with murder in the second degree. Susan Levy testified against Newbold at the preliminary hearing. After more investigation, Newbold and Susan were both indicted for capital murder, and the murder in the second degree charge against Newbold was dismissed. The trials were severed. Newbold was found guilty of murder in the second degree and was sentenced to imprisonment for life. Thereafter, Susan Levy was tried for capital murder, and was acquitted of that charge and all lesser included offenses.

The verdict against Newbold was returned on prosecution evidence. Newbold did not testify, nor did Susan Levy, nor, of course, did Beau Levy. Larry Archer, Wanda Ray [Susan's sister who was outside 1606 Elmwood at the time of the gunplay] and Frank Green [who furnished Beau Levy a pistol just moments before the affray], also, did not give testimony.

I

The defendant Newbold argues that the prosecution evidence was not sufficient to submit murder in the second degree and, cognately, that a justifiable homicide of self-defense, or defense of others, or defense of habitation, was conclusively proven, and hence mandated a judgment of acquittal. The argument rests on the postulate that the evidence to prove the theory of the prosecution—that Susan Levy and Edward Newbold plotted to lure Beau Levy to 1606 Elmwood to kill him, but made to appear as an act of self-defense—was wholly circumstantial. It was evidence, moreover, so permeated with contradictions and lapses as to fail as circumstantial proof of that hypothesis of guilt, but rather was reconcilable with his theory of self-defense—and innocence.

The testimony of the prosecution witnesses was, indeed, riddled with inconsistencies. There was scarcely a single narration sustained without internal contradiction, or which did not gainsay the testimony of other witnesses about the same episode. It was also the fact that, with few exceptions, the witnesses were convicted felons or misdemeanants, so that their credibility was in doubt. The contradictions notwithstanding, however, the evidence remained probative of the issues, and it was for the jury to assess the credibility of the witnesses as impugned and to give or withhold credence to their testimony. The testimony of a single witness on an issue, moreover, suffices as substantial evidence so as to render that issue submissible. *State v. Williams*, 652 S.W.2d 102.-111[15–19] (Mo. banc 1983). The jury was entitled to accept some of the testimony of a single witness and reject the rest, or to prefer the full account by one witness over that of another. *State v. Holt*, 592 S.W.2d 759, 774[24, 25] (Mo. banc 1980).

■ Moreover it is not a *theory* of prosecution as such that the evidence must prove to sustain conviction [as the defendant argues], but the substantive offense as defined by statute and submitted to the jury—in this case, that Newbold alone, or with Susan Levy as accomplice, committed the second degree murder of Beau Levy in violation of § 565.004, RSMo 1978. *State v. Pickins*, 660 S.W.2d 705, 707[1, 2] (Mo. App.1983). That the evidence failed to prove the prosecution hypothesis [as defendant argues] that Newbold—either alone or with Susan Levy as accomplice—lured Beau Levy to the house to kill him, therefore, does not disparage the conviction if the evidence otherwise proves the substantive elements of murder in the second degree, an offense included in the charge of the information, then submitted by instruction, and returned by the verdict of the jury. *State v. Craig*, 642 S.W.2d 98, 101[11, 12] (Mo. banc 1982); *State v. Smith*, 411 S.W.2d 89, 91[2–4] (Mo.1967).

■ To sustain the contention that the evidence did not prove the murder in the second degree offense against Newbold, the defendant argues the principle that when the prosecution case rests on circumstantial evidence, " 'the facts and circumstances must be consistent with each other and with the hypothesis of defendant's guilt, and they must be inconsistent with his innocence and exclude every reasonable hypothesis of his innocence.' " *State v. Franco*, 544 S.W.2d 533, 534[1–4] (Mo. banc 1977). That rule, however, appertains only when all of the evidence is circumstantial and not when, as here, there is direct evidence of essential elements of the proof of guilt. *State v. Ritterbach*, 637 S.W.2d 820, 823 (Mo.App.1982). *Circumstantial evidence* is evidence which does not directly prove a fact, in issue, but gives rise to a logical inference that the fact exists. *State v. Regazzi*, 379 S.W.2d 575, 578[1, 2] (Mo. 1964). *Direct evidence* is evidence which proves the existence of a fact in issue without other inference of that fact. *State v. Scaturro*, 509 S.W.2d 491, 493[1] (Mo.App. 1974).

Admissions of a criminal defendant are direct evidence of his guilt. *State v. Stevens*, 467 S.W.2d 10, 25[23–25] (Mo.1971). Thus, the admission by Newbold to Jesse Brown: "Jesse, looks like I've shot Beau ... I just turned around and got the shotgun that I had in my hands and shot three times through the door ... I didn't know it was Beau," directly bears to prove that Newbold shot with the intent to kill. The admission by Newbold to the police that he obtained the shotgun [although by his version to the police, Susan fired the weapon] bears as direct evidence of a premeditated purpose to use the weapon. The admission by Newbold to the police that he aided and expedited the neighbor boy, Kevin Metacalf, "to get rid of the gun" after the shooting, bears as direct evidence of guilt. The numerous excerpts from the letters by Newbold, written while under charge for murder in the second degree, to Susan Levy's sister and others, however ambiguous, also bear as direct evidence of guilt. There were other admissions in evidence. A few days before the homicide, Newbold told Judy Hall, a neighbor of Susan Levy, that the solution to the marital discord between Susan and Beau was that Susan

use the .38 caliber pistol she owned. A few months earlier, Newbold had told Sellars—after an argument between Sellars and Beau Levy—"You ought to just waste that sucker." There was another statement of that ilk in evidence, when Newbold spoke to Linda Sellars in emphatic language about "putting someone in the ground"—Beau Levy, she assumed. These admissions are all direct evidence of malice.

The proof of the offense against Newbold, therefore, was interspersed with direct evidence as well as circumstantial evidence of guilt.

In such a case, the test to determine the sufficiency of the conviction of murder in the second degree against Newbold, rather, is whether all the evidence [circumstantial as well as direct] which supports the jury determination of guilt together with all favorable inference taken as true, and the adverse inferences from the evidence discounted, the elements of the offense have been proven by substantial evidence. *State v. Craig*, 642 S.W.2d at 101[9]; *State v. Williams*, 652 S.W.2d at 111[15–19].

■■■ The defendant Newbold was convicted for murder in the second degree as defined by § 565.004, RSMo 1978.[2] Murder in the second degree under that statute was the "wilful, premeditated killing of a human being with malice aforethought." *State v. Franco*, 544 S.W.2d at 535. In that formulation, *willful* means intentionally or knowingly. *State v. Cook*, 557 S.W.2d 484, 485[1–5] (Mo.App.1977). *Premeditation* means thought of beforehand for any length of time, however short. *State v. Wood*, 596 S.W.2d 394, 400[7–10] (Mo. banc 1980). *Malice* means the intentional doing of a wrongful act without just cause or excuse. *State v. Powell*, 630 S.W.2d 168, 170 (Mo.App.1982). There is no doubt that the evidence taken most favorably to the verdict of conviction proves murder in the second degree, and that Newbold committed the offense. That evidence, recapitulated, shows that Newbold was the lover of the wife of the victim Beau Levy. In numerous statements, Newbold expressed his malevolence towards the victim—that Newbold was tired of his interference with the life of Susan Levy, and that he was going to "put him in the ground." Newbold suggested to Mark Sellars after an argument with the victim that Beau Levy should be "wasted." Newbold [the jury could and did believe] motivated a chain of incitements which brought Beau to 1606 Elmwood, armed, and a victim for death: Newbold telephoned Carl Levy, brother of the victim, to warn that Archer was on his way with a gun to kill Sellars. That prompted Sellars to arm. Newbold then appeared at the Carl Levy house to announce that Archer was on his way to the Susan Levy home, and that Newbold needed a shotgun to protect Susan and the child. Newbold thus established the pretext to arm, and did arm. Newbold, moreover, encouraged those present to tell Beau that Archer was "down at Sue's house waving a gun at his wife and daughter and he'd better get a pistol and get down there." They transmitted that warning to Beau and Beau replied that he would go to Susan's "to see what was wrong." That prompted Beau to arm, and he did arm. Beau proceeded to 1606 Elmwood, struck at the inner front door with his boots, fired a shot. Newbold fired the shotgun through the front door from the interior of the house, and Beau was killed. In fact [the jury could and did believe] Archer was neither armed nor a threat to Susan, the child, or to anyone else.

■■■ This evidence, moreover—and contrary to the contention of Newbold, proves specific intent of the defendant to kill Beau Levy. The intent to kill may be inferred from the circumstances, and when the assault is by means likely to produce death,

---

2. *Murder in the second degree* § 565.004 was repealed by L.1983, p. 922, S.B. No. 276 § 1. That same legislation enacted *in lieu* new *Second degree murder* § 565.021. Then, L.1984, p. 757, S.W. No. 448 § A, changed the effective date of new § 565.021 to October 1, 1984. The offense for which Newbold was convicted was for criminal conduct on January 24, 1984. Thus, the prosecution and conviction for murder in the second degree was governed by then § 565.004.

the actor is presumed to have intended death. *State v. Powell,* 630 S.W.2d at 170; *State v. Cook,* 557 S.W.2d at 487[5, 6].

The argument of Newbold that the jury determination of guilt rests on attenuated inferences and hence is not sufficient proof of the ultimate issue, rests on a selective and contrived view of the evidence. It invokes such aphorisms as "[a]ppellant's mere presence in the house at 1606 Elmwood is insufficient to support a conviction" to argue the invalidity of an issue found from stacked inferences. The conviction, however, rests on more than mere presence at the scene—it rests on the reticule of evidence, direct and circumstantial, of a plan to entice the victim to his death, and the consummation of that plan by the use of a deadly weapon upon the victim. That Newbold was the person who fired the shotgun through the door, and wounded and killed Beau, is proven by his admission of that fact to Jesse Brown. That Susan Levy made a like admission heard by Lisa Comacho does not impair a jury determination that Newbold, not Susan was the assailant. The decision Newbold cites as an impermissible verdict of guilt based upon attentuated and stacked inferences, *State v. Gonzales,* 533 S.W.2d 268 (Mo. App.1976), simply bears no factual resemblance to the proof adduced to convict Newbold.

It was the hypothesis of defense that the use of deadly force by Newbold [or by Susan Levy] was an act of self-defense, and hence the homicide of Beau Levy was justifiable. Newbold argues on appeal that the proof of self-defense was conclusive and entitled him to an acquittal as a matter of law. A court, of course, may direct the acquittal of a criminal defendant where the evidence raises the issue of self-defense. Such a direction determines, however, that the prosecution has failed to prove the crime charged, and not that self-defense was proven as a matter of law. *State v. Rash,* 359 Mo. 215, 221 S.W.2d 124, 126[6] (1949).

Self-defense was submitted by Instruction No. 14. [The instruction is the subject of a separate contention of error which the opinion treats in due course.] The gist of self-defense is that the defendant acts on the reasonable belief of imminent danger of serious bodily harm or death, employs no more force than appears reasonably necessary to save himself from that danger, and acts to the uttermost to avoid the danger. *State v. Chambers,* 671 S.W.2d 781, 783[1–3] (Mo. banc 1984). That is to say, a claim of self-defense is a claim that the defender acted without malice: that the defender did not provoke the fray and acted only to protect against the threat of unlawful force. *State v. Grier,* 609 S.W.2d 201, 203[4–7] (Mo.App.1980). It is malice—the guilty mental state requisite for the perpetration of murder in the second degree—therefore, that self-defense disproves. *State v. Rash,* 221 S.W.2d at 126[6]. Where the evidence shows self-defense, the issue becomes an element of the case and the prosecution bears the burden to prove an absence of justification. *State v. McGowan,* 621 S.W.2d 557, 559[7–9] (Mo. App.1981). If as a matter of law, therefore, the evidence does not prove malice, then, as a matter of law, murder in the second degree in every element [lack of self-defense included] is not proven prima facie and the defendant is entitled to a judgment of acquittal. That is not because, as defendant argues, the evidence proved self-defense as a matter of law, but because the offense was not proven as a matter of law.

The evidence of malice and of every other element of the murder in the second degree charged against Newbold, however, was substantial to render the offense [and self-defense] a jury issue. The motive to remove Beau as a source of interference in the dalliance between Newbold and the wife of the victim—to "put him in the ground" in the words of Newbold—bears to discredit the claim of self-defense. That is so particularly where, as here, the defendant admitted that he fired the weapon which inflicted the death. *State v. Crabtree,* 625 S.W.2d 670, 676[2] (Mo.App.1981). The evidence, already recounted, was abundant that Newbold by his antics induced the presence of Beau Levy, armed, at the 1606 Elmwood premises with the design to

kill Beau. The jury accepted those inferences from the evidence and, cognately, rejected the claim of self-defense—that the shooting was unprovoked. That determination was supported by the evidence.

## II

The defendant contends error, also, in the formulation of numerous jury instructions. He argues a fatal variance between the indictments and instructions in that the instructions allowed the jury to return a verdict of guilty if Susan Levy *or* Newbold committed the essential elements of the crime, whereas the indictment charged Susan Levy *and* Newbold with the crime. He argues also that the evidence shows—if anything—that all of the elements of the offense were committed solely by Newbold, so that the ordinary verdict director sufficed. The instructions which formulate and submit the offense in terms of accessory responsibility, therefore, not only impermissibly enlarge the criminal liability of the indictment, but [Newbold argues] also submit on a theory the evidence does not prove.

It was the posture of the prosecution throughout that the homicide of Beau Levy was the culmination of a scheme concocted and acted upon by Susan Levy and Newbold with the common purpose to lure Beau, through stratagems, to 1606 Elmwood in order to kill him—but made to appear as an act of self-defense. There is no evidence that Susan concocted such a scheme or that she acted with the common purpose to lure him to the residence to kill him. There is evidence, however, that Susan Levy, armed with a shotgun, expected Beau at the 1606 Elmwood premises, and that after the front door was battered [by Beau's boots], it was Susan Levy who fired the shotgun from the interior through the

front door and killed Beau. There was evidence that Susan then learned it was Beau who was shot and dead, and *then* enlisted the boy, Kevin Metcalf, to hide the weapon. This was evidence, that is to say, of guilt of an intended unprovoked homicide, and not of justified defense. That evidence shows that if Susan did not act throughout with Newbold with the common purpose to lure Beau to the premises to kill him, at least at some time before Beau arrived, Susan armed herself and joined the purpose of Newbold to promote the death of Beau Levy.

Thus, the evidence allowed two views of the homicide event propitious to the prosecution. The first was that Newbold acted alone throughout, and it was he who fired the shotgun. In that event, the elements of the offense were committed solely by Newbold—the culpable mental state included—and murder was submissible in the usual way in the form of MAI–CR2d 15.14. The second was that Susan Levy joined in the criminal enterprise some time after Newbold returned to the residence with the shotgun, and thereafter Susan aided and abetted Newbold in the purpose to promote the death of Beau Levy, and it was she who fired the shotgun. In that event, the conduct of the accomplice Susan as to the phase of the offense committed by her [the discharge of the shotgun through the door at Beau Levy] was attributable to the defendant under the law,[3] and the offense was submissible under murder in the second degree form MAI–CR2d 15.14 combined with accomplice liability form MAI–CR2d 2.12. *State v. Roberts*, 709 S.W.2d 857, 860[1] (Mo. banc 1986); *State v. Price*, 684 S.W.2d 566, 567[2] (Mo.App.1984).

■ We reject, therefore, the contention of the defendant Newbold that it was error

---

3. Section 562.036. *Accountability for conduct.* A person with the required culpable mental state is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is criminally responsible, or both.

Section 562.041. *Responsibility for the conduct of another.*
 1. A person is criminally responsible for the conduct of another when

. . . .
 (2) Either before or *during the commission of an offense with the purpose of promoting the commission of an offense,* he aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense.
[emphasis added]

to formulate the alternative verdict directors submitted by the prosecution [capital murder, murder in the second degree and manslaughter] in terms of accomplice liability MAI–CR2d 2.12.[4] That is because, contrary to argument, there was evidence that during the commission of the offense by Newbold, Susan Levy aided Newbold with purpose to promote the offense—by the discharge of the weapon and the infliction of the death wound on Beau Levy. Nor is the use of accomplice liability MAI–CR2d 2.12 interdicted because the evidence may show that the defendant acted alone to commit all the elements of the offense. Notes on Use 4 to MAI–CR2d 2.12 applies aptly to the nature of the proof· before us—and dispels the argument of defendant Newbold altogether:

> Since MAI–CR2d 2.12 involves imputing the conduct of another person to the defendant, it *need not be (but may be) used* where the evidence shows that the defendant, by his own conduct, committed all the elements of the offense even if there is also evidence showing another person (or persons) was involved. [emphasis added]

In such a case, as Notes on Use 4 and 6(d) explain, "the ordinary verdict director ascribing all the elements to the defendant is sufficient ... However, MAI–CR2d 2.12 can be adapted to cover this situation *but using it puts an additional and unnecessary burden on the prosecution.*" [emphasis added] Thus, even were the evidence conclusive that only Newbold committed the offense by his own conduct, the use of MAI–CR2d 2.12 was not precluded to the prosecution, but served only to impose a greater burden than the law required. *State v. Johns,* 679 S.W.2d 253, 259[1, 2] (Mo. banc 1984). Notes on Use 6 advises, moreover, that the MAI–CR2d 2.12 accomplice liability formulation is apt where "the evidence is not clear as to which person committed the particular elements"—as for instance, which robber wielded the gun or which murderer fired the shot. *See State v. Kennedy,* 596 S.W.2d 766, 769[6, 7] (Mo.App.1980); *State v. Rollie,* 585 S.W.2d 78, 90[25] (Mo.App. 1979). In such a case the instruction should be formulated to "ascribe the elements to the defendant *or* the other person or persons." Instruction No. 10, which submitted murder in the second degree, conformed to that pattern.

■ The defendant Newbold cites Notes on Use 8(a), nevertheless, to argue that it was error to instruct under MAI–CR2d 2.12. Notes on Use 8(a) advises:

> This format of MAI–CR2d 2.12 covers only those situations where the defendant is to be held liable for the conduct of another person *and* that other person is also guilty of the offense. This format does NOT apply to situations where the

---

4. The murder in the second degree offense, on which the jury returned the verdict of guilty against Newbold, was submitted by Instruction No. 10, MAI–CR2d 15.14 modified by MAI–CR2d 2.12:

> If you do not find the defendant guilty of capital murder you must consider whether he is guilty of murder in the second degree.
>
> A person is responsible for his own conduct and he is also responsible for the conduct of another person in committing an offense if he acts with her with the common purpose of committing that offense, or if, for the purpose of committing that offense, he aids or encourages the other person in committing it.
>
> If you find and believe from the evidence beyond a reasonable doubt:
>
> First, that on or about January 24, 1984, in the County of Jackson, State of Missouri, the defendant or Susan Levy caused the death of Marshall Levy, by shooting him, and
>
> Second, that the defendant intended to take the life of Marshall Levy, and

Third, that the defendant or Susan Levy did not do so in fear suddenly provoked by the unexpected acts or conduct of Marshall Levy, and

Fourth, that the death of Marshall Levy was not a justifiable homicide as submitted in Instruction No. *14* or Instruction No. *15* or Instruction No. *16,*

then you are instructed that the offense of murder in the second degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

> Fifth, that with the purpose of furthering the commission of murder in the second degree, the defendant acted together with or aided Susan Levy in committing that offense,

then you will find the defendant guilty of murder in the second degree.

However, if you do not find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

defendant is being held responsible for the conduct of another person and that other person is not guilty of the offense. The defendant asserts that Susan Levy, a co-indictee and codefendant [before severance], was acquitted by the jury on September 27, 1985 [after the trial of his cause], and hence Newbold cannot be held criminally responsible for her acts, adjudicated to have been innocent. If a fair assessment of the evidence supports the conclusion that "identical charges could have been brought against both," the later adjudication of innocence of the accomplice does not invalidate the conviction of the other actor under a theory of accomplice liability. *State v. Johns*, 679 S.W.2d at 259[1, 2]. At the time of the Newbold trial, the prosecution had reasonable ground to believe that Susan Levy was also guilty of the homicide of Beau Levy.

 Newbold argues also that the verdict directors [murder in the second degree Instruction No. 10 included] were erroneous because the instructions did not define "aiding and abetting," and otherwise fail to inform that "actions taken *following* the crime do not constitute responsibility for another." We respond that it is for the court to determine from the total circumstances in evidence—presence at the scene and other incriminating factors—whether an actor was a participant in the offense charged, and hence that accomplice liability MAI–CR2d 2.12 appertains. *State v. Puckett*, 611 S.W.2d 242, 245[6–11] (Mo.App. 1981). Conduct *before or after* the commission of the offense are circumstances from which the inference of participation in the offense may legitimately derive. *Id; State v. Summers*, 660 S.W.2d 772, 773[4, 5] (Mo.App.1983). Thus, the submission of the verdict directors [murder in the second degree Instruction No. 10 included] submits the rule of accomplice liability as contemplated by MAI–CR2d 2.12. That instruction, moreover, does not submit the issue of accomplice liability in terms of "aiding and abetting," as Newbold asserts, but in terms of "aids or encourages." These are words of ordinary usage and easy understanding, and for that reason— no doubt—MAI–CR2d neither renders defi-

nition nor requires any. Instruction No. 10 conforms exactly with the directions of MAI–CR2d. We will not find error where the trial court heeds its mandates. *State v. Randolph*, 698 S.W.2d 535, 542[14] (Mo. App.1985). It is for the same reason that we reject yet another argument, that the verdict directors were erroneous because they failed to require the jury to find that Susan Levy acted with the specific intent to kill Beau. MAI–CR2d 2.12 imposes no such requirement. Instruction No. 10, the usual murder in the second degree form combined with the accomplice liability form, did require the jury to find that "the defendant [Newbold] intended to take the life of Marshall Levy." It was necessary only that the jury find the accomplice "purposely aided" in the offense. *State v. Roberts*, 709 S.W.2d 857, 863[5] (Mo. banc 1987); *State v. White*, 622 S.W.2d 939, 944 (Mo. banc 1981). That was submitted by paragraph Fifth of Instruction No. 10 in the terms of MAI–CR2d 2.12. These points are rejected.

 We reject as well the contention that there was a fatal variance between the indictment and the verdict director instructions so as to require a reversal of conviction. The indictment and information *in lieu* charged that Edward L. Newbold *and* Susan Levy committed the offense of capital murder. The verdict directors submitted guilt in terms of the conduct of Newbold *or* Levy. Newbold argues that the verdict directors thereby expanded the liability imposed by the indictment. An indictment may charge a defendant either as a principal or as an aider and encourager with the same legal effect. *Campbell v. State*, 660 S.W.2d 721, 722[5, 6] (Mo.App. 1983). The statutes which now define when a person is criminally responsible for the conduct of another do not affect that principle. §§ 562.036 and 562.041. A variance between the charge of offense and the verdict director, moreover, is not fatal unless a charge, new and distinct from the offense alleged, is submitted to the jury for return of conviction. *State v. Jelks*, 672 S.W.2d 722, 724[8, 9] (Mo.App.1984). The defendant Newbold was found guilty of an

offense included in the crime charged by the indictment, and hence there was no variance between charge and conviction. Newbold and Susan Levy were named as co-indictees. He was informed by that very fact that the prosecution deemed her a coparticipant and would undertake to prove her complicity. Thus, the defendant Newbold cannot reasonably complain that his defense was prejudiced. The point is denied.

Newbold complains also of the self-defense instructions. To justify the homicide, Instruction No. 14 submitted lawful defense of the person and Instruction No. 15 submitted lawful defense of premises. In order to justify deadly force in lawful self-defense, there must be proof—among other elements—of "a real or apparently real necessity for the defender to kill in order to save himself from an immediate danger of *serious bodily injury or death.*" [emphasis added] *State v. Chambers,* 671 S.W.2d 781, 783[1–3] (Mo. banc 1984). Instruction No. 14 submitted that element of self-defense in terms which omitted the word *death.* Thus, the jury was told that Newbold or Susan Levy only had to believe a necessity, real or apparently real, to use deadly force to protect against the imminent danger or *serious physical injury* from the attacker. Newbold claims that the neglect to include the word *death* in that element of the submission was prejudicial error. That claim, however, was not preserved for review either by contemporaneous objection or by motion for new trial, and hence we do not respond. *State v. Moland,* 626 S.W.2d 368, 370[1–3] (Mo. 1982). Newbold claims plain error. The lapse in the instruction, however, was an advantage to the defendant and so there is no ground for complaint. That is because by the very statement the jury was told that Newbold or Susan Levy had only to believe an imminent threat of bodily injury to respond with deadly force. We reject the claim of a manifest injustice, and hence of plain error. *State v. Phroper,* 619 S.W.2d 83, 89[7–9] (Mo.App.1981). The contention of error, preserved or unpreserved, is in any event spurious. MAI–CR2d 33.01 defines *serious physical inju-*

*ry* to mean: "physical injury that creates a substantial risk of death...." That definition was included in Instruction No. 7 and rendered to the jury.

There remains the complaint as to defense of premises Instruction No. 15. The elements of that instruction [as of the other self-defense submission, the converse and all of the verdict directors] were formulated in terms of accomplice liability— "that the defendant or Susan Levy, etc." That ascription of accomplice conduct "or Susan Levy" was used throughout every element of defense of premises Instruction No. 15 as prescribed—in ¶¶ 1, 2 and 4. It was prescribed three times for the ¶ 3 element, but was used only twice.

> 3. If the defendant or Susan Levy reasonably believed it was necessary to use the amount of physical force he or she used ... If the defendant or Susan Levy acted in lawful defense of premises as submitted in this instruction, the defendant must be acquitted even though there was no purpose on the part of Marshall Levy to commit burglary of Susan Levy's dwelling and no actual necessity to use such physical force *as the defendant used.* [emphasis added]

Newbold argues that the final phrase was properly *as the defendant or Susan Levy used* and that the omission of *or Susan Levy* was prejudicial. That lapse was error, but there was no prejudice. That attribution of accomplice liability, *the defendant or Susan Levy* [or its necessary variation] was repeated forty-seven times throughout the range of submissions. The jury could not have been misled to the verdict. Instruction No. 15 makes clear that the defense of lawful defense of premises was proven if either Susan Levy or Newbold fired the shots in the reasonable belief that the discharge of the weapon was necessary to prevent an unlawful entry. The error was harmless. *See State v. Danforth,* 654 S.W.2d 912, 923[19–22] (Mo. App.1983).

### III.

Newbold also challenges the admission of certain statements. Jesse Brown was

presented as a witness for the prosecution. He arrived at the Susan Levy premises to tow her car for repairs some short time before the homicide. He had been there for some five minutes when Newbold arrived with the shotgun, and displayed the weapon to Brown. The witness was then asked whether Susan Levy had any conversation with Newbold. The defendant objected that response would be hearsay, but the court allowed the evidence as the statement of a co-conspirator—and hence as the statement of the defendant. Brown related that Susan told Newbold that "Marshall [Beau] would be over in a little bit, and he [Newbold] said, 'That's good.'" Newbold acknowledges that a conspiracy proven, prima facie, the statements of a co-conspirator made in the furtherance of the illegal scheme are admissible as an exception to the hearsay rule. He argues validly that the hearsay statements may not be used to prove conspiracy—and hence admissibility. *See State v. Fuhr*, 660 S.W.2d 443, 447[3–6] (Mo.App.1983). Newbold contends that other than the statement of Jesse Brown there was no evidence of conspiracy, and hence that testimony remains hearsay.

 Our opinion rejects the contention that the evidence did not prove the submissions formulated on the theory of accomplice liability. It determines, rather, that although Susan Levy may not have acted throughout with Newbold, the evidence allows the inference that at least at some time before Beau arrived Susan joined the purpose of Newbold to promote the death of Beau Levy. A conspiracy may be shown to exist by circumstantial as well as by direct evidence. *State v. Danforth*, 654 S.W.2d at 920[10]. The inference of aid and encouragement by Susan Levy of the Newbold purpose to kill Levy the trial court could have found from the evidence that minutes before the homicide event, Newbold returned to the 1606 Elmwood premises armed with a shotgun, Susan accepted the weapon from Newbold, awaited the expected arrival of Beau, and then when his presence became known, fired the shotgun through the door. Susan then opened the front door, lay the gun aside, saw that it was Beau who was shot and

dead, and exclaimed to those present: "I" or "We" [Lisa Comacho was not certain which] "heard shots and we shot back." Then—*after* she saw that it was Beau dead on the ground—she enlisted Kevin Metcalf to secrete the gun. The latter conduct, as we note, was evidence that the shooting was a guilty act and not a defensive attack to an unprovoked attack. Thus, at the time Susan told Newbold [as related by Jesse Brown]: "Marshall [Beau] would be over in a little bit," and Newbold responded, "That's good," the trial court could have reasonably concluded that Susan Levy had already joined the illegal scheme by Newbold to kill Beau. The testimony by Jesse Brown was admissible.

Newbold contends error in the admission of other evidence. The original charge against Newbold was murder in the second degree. While under charge, Newbold wrote numerous letters to Susan Levy and others. Those overtures prompted the prosecution to add the charge against Newbold of tampering with a witness. In due course, Newbold and Susan Levy were indicted as codefendants to capital murder. The murder in the second degree and tampering charges against Newbold were then dismissed. At the separate trial of Newbold for capital murder [the conviction under review] the letters written by Newbold to Susan and others [while he was under the original charge of murder in the second degree] were identified by Linda Sellars as in the hand of Newbold. Selected portions of the letters were received in evidence. The content of the letters related to the murder in the second degree and tampering charges. [They were all written before Newbold and Susan Levy were indicted for capital murder.]

Newbold argues that the excerpts admitted at the trial constituted proof of the commission of separate and distinct crimes, and were not admissible—under the familiar statement of principle—unless the evidence had a legitimate tendency to establish guilt of the charge on trial. The prosecution argues that the evidence, indeed, tended to prove the guilt of the defendant

Newbold, and was therefore properly admitted.

The letters to Wanda Ray [Susan's sister] contained these passages:

> Bobby in St. Louis will bless you and Sue if all goes well.
>
> If she stays away then I'll beat the case. If Susan takes the case she'll get probation on 4th degree manslaughter or self-defense since it was her house and Beau was there earlier that day. What's going on with Sue? Is she going to take the case or give it to me?

Another letter to Tanya Clark [Wanda's daughter] contained these passages: "Tell Bubba Red [Tanya's step-father] to school Wanda and Sue." "Sue can't get anything but two years probation at the most, more likely self-defense. What was your mom's statement to the cops? What was Sue's?"

These portions of the Newbold letter to Glen and Linda Barlow [with whom Susan stayed after she moved out of 1606 Elmwood] were also read:

> You can tally up Sue's incurring bills and let me know what she owes you. I'll take care of that too.
>
> I'd probably still take her back if she took her self-defense case.
>
> If she just said that her first statement [presumably to the police to whom she acknowledged, at first, that she fired the gun, but .then recanted that Newbold fired the weapon] is the truth, then she'll get the other 25 grand from the insurance company and she can call me any time.
>
> Also, defense of habitation is a better form of defense. She had a right to shoot anyone if she felt her life was in danger. It's a better defense.
>
> Tell Susie Coco said he's upset at her over not taking the case.
>
> Well, I loved and lost. Now I have to sit and listen to love songs on the radio and hurt, and I still won't have the bitch killed. I'll always love the black widow spider bitch and she'll always have a place in my heart. I do believe this, if I ever see her I'll slap the piss out of her and shame on her boyfriend if he doesn't like it. But that's all I'd ever do to her.

These statements are replete with words of cajolery to Susan to "take the case," the promise of reward if she did, the advice that a claim of defense of habitation would exculpate her [or at worst result in probation], blandishments of reward for compliance, and threats of reprisal if she refused. In composite, the evidence allows inference of a stratagem proposed by Newbold to Susan Levy to exonerate him from the charge of murder in the second degree by a confession to the police that she—not Newbold—fired the shotgun that killed Beau [as indeed was her first version to the police], that he would reward her by the payment of her bills if she did, and would take reprisal if she did not. Evidence of threats by the defendant against an adverse witness are probative of guilt as to the charge on trial. *State v. Mason,* 394 S.W.2d 343, 344[2] (Mo.1965). Such testimony is also admissible as an exception to the rule against evidence of separate and distinct offenses—since it tends to prove the identity of the person who committed the offense on trial. *State v. Corlew,* 463 S.W.2d 836, 840[5] (Mo. 1971). These acts and declarations of Newbold after the commission of the offense are probative of a disposition to mislead and obstruct prosecution, and hence of a consciousness of guilt. *State v. Brooks,* 551 S.W.2d 634, 647[9–12] (Mo.App.1977). However these excerpted statements may have impinged as evidence of other crimes [the murder in the second degree and tampering offenses later dismissed], they constituted proof of threats against a witness and a deliberate obstruction of the prosecution of the offense on trial and hence not only were probative of a consciousness of guilt, but were admissible to prove that Newbold was indeed the perpetrator of the offense on trial.

The judgment of conviction is affirmed.

All concur.